Charles L. DAVIS and Arthur J. Lewis,
Plaintiffs,

v.

Gary L. CAMERON, Secretary of State
of Iowa, et al., Defendants.

Civ. No. 5–1289.

United States District Court
S. D. Iowa,
Central Division.

Feb. 11, 1965.

McManus, District Judge, dissented
in part.

Harry H. Smith, Sioux City, Iowa,
Robert F. Wilson, Cedar Rapids, Iowa,
C. A. Frerichs, Waterloo, Iowa, for
plaintiffs.

Larry Scalise, Atty. Gen., for State
of Iowa, Des Moines, Iowa, Timothy Mc-
Carthy, Solicitor Gen., for State of Iowa,
Des Moines, Iowa, for defendants.

J. Robert Hard, R. E. Killmar, W. W.
Reynoldson, Edward T. Harvey, Jr., Kill-
mar, Reynoldson & Harvey, Osceola,
Iowa, for defendant Albert Drake.

Before VAN OOSTERHOUT, Circuit
Judge, and STEPHENSON and
McMANUS, District Judges.

STEPHENSON, District Judge.

This matter is now before the Court on the application of plaintiffs that the statutory plan of apportionment, 60th General Assembly of Iowa, Special Session, Senate File 1, (hereinafter referred to as Senate File 1) be declared prospectively invalid and inoperative for all future elections to the General Assembly of the State of Iowa.[1] On March 27, 1964, this Court approved Senate File 1 as an interim plan of apportionment and in so doing stated, "In the absence of further guidance from the Supreme Court of the United States, this Court is of the opinion that Senate File 1 is not so objectionable on federal constitutional grounds as to warrant disapproval as an interim plan of apportionment." Davis v. Synhorst, D.C., 231 F.Supp. 540, 541 (1964).

All of the defendants except Albert Drake appear by the Attorney General of Iowa, and in resistance to plaintiffs' application ask that the Court hold this matter in abeyance for a reasonable period of time during which the Sixty-first General Assembly will have an opportunity to apportion itself.

Defendant Albert Drake resists plaintiffs' application alleging that the judgment entered by this Court on March 27, 1964 was a final adjudication and plaintiffs having failed to appeal therefrom, this cause cannot now be revived in the manner attempted by plaintiffs. Alternatively said defendant requests that this matter be held in abeyance pending action by the present session of the General Assembly.

■ The challenge to this Court's jurisdiction to act with respect to the statutory plan of apportionment is without merit. On June 22, 1964, the Supreme Court of the United States remanded this cause with directions as follows: "The case is remanded for further proceedings, with respect to relief, consistent with the views stated in our opinions in Reynolds v. Sims and in the other cases relating to state legislative apportionment decided along with Reynolds, should that become necessary." Hill v. Davis, 378 U.S. 565, 84 S.Ct. 1918, 12 L.Ed.2d 1037. Since plaintiffs have now challenged the validity of the statutory (temporary) reapportionment plan, Senate File 1, we must determine if this plan comports with the federal constitutional standards set out in Reynolds v. Sims and other cases relating to state legislative apportionment decided by the Supreme Court along with Reynolds.[2]

Plaintiffs urge that under Senate File 1, both the Iowa House and Senate fail to meet minimum guidelines reasonably deductible from the Supreme Court decisions. Plaintiffs suggest that no less than 45% of a state's population should be able to elect a majority of the legislators in a state representative body and there should be no population variances in either house among legislative districts greater than 2–1. The Attorney General in oral argument expressed the opinion that the House portion of Senate File 1 was proper, but that the Senate was not. Counsel for the defendant Drake did not concede that either house was invalid under the statutory plan.

Under Senate File 1 from 44.02% to 48.3% of the population can elect a majority of the members of the House of Representatives. The maximum disparity in population between representa-

---

1. At the hearing plaintiffs withdrew their application for a ruling on the validity of the proposed constitutional plan of apportionment upon the basis that action by the Court on the statutory plan should furnish adequate guidance with respect to the constitutional plan.

2. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (Alabama); WMCA, Inc. v. Lomenzo, 377 U.S. 633,

84 S.Ct. 1418, 12 L.Ed.2d 568 (New York); Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (Maryland); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1444, 12 L.Ed.2d 609 (Virginia); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (Delaware); Lucas v. Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (Colorado).

tive districts is approximately 2.23 to 1. Approximately 38.9% of the state's population can elect a majority of the members of the Senate. The maximum disparity in population between senatorial districts is approximately 3.20 to 1 (adjustment is made for multiple representative districts). Davis v. Synhorst, 231 F.Supp. 540, 541 (1964). Following is a summary of mathematical disparities in population—representation existing in apportionment schemes found unsatisfactory in the recent Supreme Court opinions:

| State and case | Population variances among districts (upper and lower house) | Percentage represented by majority (upper and lower house) |
|---|---|---|
| Alabama, Reynolds v. Sims | *20–1 and 5–1 | 27.6% and 37% (43%) |
| New York, WMCA, Inc. v. Lomenzo | **3.9–1 and 21–1 ***2.6–1 and 12.7–1 | 41.8% and 34.7% 38.1% and 37.5% |
| Maryland, Maryland Committee for Fair Representation v. Tawes | 34–1 and 6–1 | 14.1% and 35.6% |
| Virginia, Davis v. Mann | 2.65–1 and 4.36–1 | 41.1% and 40.5% |
| Delaware, Roman v. Sincock | 15–1 and 12–1 | 21% and 28% |
| Colorado, Lucas v. Forty-fourth General Assembly | 3.6–1 and 1.7–1 | 33.2% and 45.1% |

*Crawford-Webb Act; lower house 43% under 67-Senator Amendment.

**Under current statutes.

***Under existing constitutional formulas.

By comparison, the Iowa House under Senate File 1 is more representative (percentage represented by a majority, 44.02% to 48.3%) and there are less population variances among districts (2.23 to 1) than any apportionment scheme found unconstitutional by the Supreme Court in these decisions. On the other hand, the Iowa Senate is less representative (percentage represented by a majority 38.9%) than that found unconstitutional in Davis v. Mann (41.1% and 40.5%) and the population variance among districts (3.20 to 1) is greater than in the Virginia Senate in Davis v. Mann (2.65 to 1). In making these comparisons this Court does not purport to lay down a mathematical formula for evaluating the constitutional validity of the statutory apportionment plan. The Supreme Court has refused to adopt such an approach. In Roman v. Sincock, supra, 377 U.S. at 710, 84 S.Ct. at 1458, the Supreme Court said:

"Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the

particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

The Supreme Court has now furnished guidelines governing federal constitutional requirements for apportionment in state legislatures. They are discussed at length in the cases previously cited herein.[3] We do not propose to repeat them all here.[4] For our purposes the following guidelines in addition to those otherwise stated herein are set out in Reynolds v. Sims, supra, as follows:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." 377 U.S. at 568, 84 S.Ct. at 1385.

" * * * So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle." 377 U.S. at 579–580, 84 S.Ct. at 1391.

\* \* \*

" * * * a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained." 377 U.S. at 580, 84 S.Ct. at 1391.

We hold that the apportionment of senate seats under Senate File 1 involves departures from population-based representation too extreme to meet the minimal standards promulgated by the United States Supreme Court in the recent cases which have been cited herein. We do not pass on the question of whether the House under Senate File 1 is apportioned sufficiently on a population basis to comport with federal constitutional requirements. It is arguably close. Apportionment of the House and Senate under Senate File 1 is not severable. The apportionment scheme as a whole must be considered. Lucas v. Colorado General Assembly, supra, 377 U.S. 734, 735, 84 S.Ct. 1459, 12 L.Ed.2d 632;[5] Maryland Committee for Fair Representation v. Tawes, supra, 377 U.

---

3. See Footnote 2.

4. For excellent summary see Honsey v. Donovan, 236 F.Supp. 8, 13–15 (D.C. Minn.1964).

5. 377 U.S. at 735, n. 27, 84 S.Ct. at 1473, the Supreme Court said, "Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause. Deviations from a strict population basis, so long rationally justifiable, may be utilized to balance a slight overrepresentation of a particular area in one house with a minor underrepresentation of that area in the other house. But, on the other hand, disparities from population-based representation, though minor, may be cumulative instead of offsetting where the same areas are disadvantaged in both houses of a state legislature, and may therefore render the apportionment scheme at least constitutionally suspect."

S. at 673, 84 S.Ct. 1429; Davis v. Synhorst, 225 F.Supp. 689, 692 (S.D.Iowa 1964). See also, Forty-Fourth G.A. Colorado v. Lucas, 85 S.Ct. 715.

▉ Defendant Drake raises the additional issue that Senate File 1 is invalid because it creates two classes of representative and senatorial districts, that is, a single member and multi-member districts. He contends "that under said plan, although the voters of a majority of the counties are permitted to vote for but one representative and to elect only one representative, a voter residing in Polk County is permitted to vote for and elect eleven representatives. Thus the vote for representation in the House of Representatives of a voter residing in Polk County is thus given eleven times the weight of a voter in Ringgold County. That a voter in Polk County is a constituent of and is represented by eleven representatives in the Iowa General Assembly, whereas a voter in Ringgold County is a constituent of and is represented by only one representative in the House of Representatives." He makes similar claims with respect to variances between the single and multi-member senatorial districts. In a recent decision the Supreme Court held that the creation of multi-member districts is not in itself a violation of the Equal Protection Clause. Fortson v. Dorsey, (1965) 85 S.Ct. 498. The Court recognized in a proper case discrimination might be claimed and in this respect stated as follows:

" * * * It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political ele-

ments of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster."

Defendant Drake makes no such claim herein. We therefore hold the creation of multi-member districts is not in itself invalid. In so doing we do not comment on the wisdom of such an arrangement.[6]

### Remedy

▉ It has been requested that we hold this matter in abeyance thus permitting the Sixty-first General Assembly to make a good faith effort to meet its responsibilities in this matter. It has also been suggested that we set a deadline of 70 days within which the General Assembly must act. We have already found that Senate File 1 fails to comport with federal constitutional standards as set out in Reynolds v. Sims and related apportionment cases. Reapportionment is primarily a legislative responsibility. Judicial relief becomes appropriate only when a legislature fails to act according to federal constitutional requirements after having had a reasonable opportunity to do so. Reynolds v. Sims, supra, 377 U.S. 586, 84 S.Ct. 1362; Davis v. Synhorst, D.C., 225 F. Supp. 689, 694. There is every reason to believe the General Assembly will act with reasonable dispatch. It did so in enacting Senate File 1 which was approved as an interim plan of apportionment by this Court. Adequate time remains. The next general election of members of the General Assembly will not be held until 1966. We are satisfied that it is sufficient for us to now hold that Senate File 1 is prospectively invalid and inoperative for future elec-

6. In Lucas v. Colorado General Assembly, supra, 377 U.S. at 731, 84 S.Ct. at 1471, the Supreme Court discussed some of the undesirable features of one of the Colorado plans which required the election at large from the county as a whole of legislators from counties given more than one seat as follows: "Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multi-member county represented the county as a whole."

tions to the General Assembly of the State of Iowa.

Judgment will be entered accordingly.

(The views of District Judge Mc-MANUS, who does not join in this opinion, are stated in his dissenting opinion filed herewith.)

McMANUS, District Judge (dissenting).

I dissent in part from the Memorandum Opinion and Judgment Entry of the majority on three matters:

1. I would hold the apportionment of house seats unconstitutional as well as the senate seats under Senate File 1. The maximum population-variance ratio in the house is 2.23 to 1.[1] The following language of Chief Justice Warren speaking for the Court in, Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1382, 12 L.Ed.2d 506 (1964) with its repeated numerical references is significant:

> " * * * Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the votes of citizens in one part of the State should be given *two* times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the state's voters could vote *two*, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by *two,* five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. Of course, the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical. Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. *Two,* five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination'. * * * " (Emphasis supplied.)

While Reynolds does not require mathematical exactness, it clearly appears to hold that unconstitutional discrimination is mathematically demonstrable where the maximum population-variance ratio is 2 or more to 1.

2. The matter of sub-districting, or multi-member legislative districts, is not an issue in this case, having been pre-

---

1. Page 464 of majority Opinion.

viously decided by this court on January 14, 1964.[2] So long as a State's system of legislative apportionment meets the test of substantial equality of population among the various legislative districts, to have or not to have multi-member districts is a matter of civic taste to be determined in each State by the political majority in control.[3]

3. At the risk of being characterized as impatient, I would observe that the Iowa legislature has been malapportioned for at least 60[4] years and still is. The complaint in this case was filed over two and one-half years ago[5] and now Reynolds is nearly old enough to walk.

While I have every hope that the 61st General Assembly of Iowa, now in session, will recognize its responsibility and perform its duty to constitutionally reapportion, I don't know that it will. Because of the time already elapsed, the undesirability of resolving reapportionment at another special session with its attendant expense and dislocations, I would favor prompt and final resolution of this problem at the present session of the 61st General Assembly. Traditionally, regular sessions of Iowa General Assemblies last approximately 100 days. It is my view that this court should fix a deadline for enactment by the 61st G.A. of a statutory system of apportionment constitutionally acceptable. Such date should be at a reasonable time in the future and sufficiently prior to the traditional adjournment date to permit this court to pass on the constitutionality of any enactment before adjournment. If the 61st G.A. failed to act by the deadline, this court should do the job. Deadlines in reapportionment cases are not without precedent.[6]

2. Davis v. Synhorst, 225 F.Supp. 689, 692.

3. Reynolds v. Sims, supra, 377 U.S. at 578, 84 S.Ct. 1390.
   " * * * A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multi-member or floterial districts. Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State. * * * "

4. 12th Amendment (amendment No. 2 of 1904) to the Iowa Constitution, Article 3, §§ 34–36, I.C.A.

5. August 9, 1962.

6. Hughes v. WMCA, Inc., 85 S.Ct. 713.